UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
--------------------------------------------------------------

CHERYL WHITE, On Behalf of Herself and All
Others Similarly Situated

               Plaintiff,

      v.

MANDIANT, INC., ENRIQUE SALEM,
KEVIN MANDIA, KIMBERLY ALEXY,
SARA C. ANDREWS, RONALD E.F. CODD,
ARTHUR W. COVIELLO, JR., ADRIAN
MCDERMOTT, VIRAL PATEL, AND
ROBERT SWITZ.

               Defendants.

Case No.

**CLASS ACTION**

**COMPLAINT FOR VIOLATIONS OF
SECTIONS 14(a) AND 20(a) OF THE
SECURITIES EXCHANGE ACT OF
1934**

**JURY TRIAL DEMANDED**

Plaintiff Cheryl White ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to herself and her own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by her attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.[1]

## NATURE OF THE ACTION

1.    This action is brought by Plaintiff, on behalf of herself and the Class (as defined below), against Mandiant, Inc. ("Mandiant" or the "Company") and the members of the Company's Board ("Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange

---

[1] In quotations, all emphasis is added, unless otherwise noted, and all internal quotations and citations are omitted.

Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9"). Plaintiff's claims arise in connection with the solicitation of Mandiant Stockholders to, *inter alia*, vote in favor of a merger transaction ("Merger") pursuant to which Mandiant will merge into and survive as a wholly-owned subsidiary of Google LLC ("Google"), in exchange for payment of $23.00 per share in cash by Google to Mandiant's public stockholders ("Mandiant Stockholders"). Google is a subsidiary of Alphabet Inc. (ticker: GOOG) ("Alphabet").

2.      On March 8, 2022, Mandiant announced that the Board had approved the sale of the Company to Google for $23.00 per share in cash ("Merger Consideration"), pursuant to a merger agreement ("Merger Agreement").

3.      On April 28, 2022, Defendants authorized the filing of a materially false and misleading definitive proxy statement on Schedule 14A ("Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, with the aim of soliciting Mandiant Stockholders to vote for the Merger and certain related proposals.

4.      First, the Proxy purports to disclose all interests of Mandiant directors and officers in the Merger that differ from or are in addition to the interests of public Mandiant Stockholders, but fails to disclose (i) the affiliations of Defendants Viral Patel (a member of the Transaction Committee) and Arthur W. Coviello, Jr. with institutional preferred stockholders that will realize approximately $566 million in cash proceeds from the Merger upon conversion of their preferred stock into Mandiant common stock, and (ii) the nature and magnitude of the post-Merger "cash and equity incentives" to which Mandiant's CEO, Defendant Kevin Mandia ("Mandia"), is entitled under a "new offer letter" with Google (despite conceding that Mandiant Shareholders should be aware of such incentives, and representing that the Board considered such incentives in approving

2

and recommending the Merger).

5.    Second, the Proxy fails to confirm whether or not there were any discussions between Google and Mandia generally concerning the prospect of post-Merger employment prior to approval of the material terms of the Merger by the Board.

6.    Third, after purporting to disclose all underwriting services provided to Google and its parent Alphabet by the Board's financial advisor on the Merger—Goldman Sachs & Co. LLC ("Goldman Sachs")— during the past two years (and the compensation received for such services), the Proxy fails to disclose Goldman Sachs's role as one of the lead joint bookrunners for a $10 billion convertible note offering by Alphabet in August 2020 on which Goldman Sachs earned approximately $7.25 million according to SEC filings.

7.    The above material misrepresentations and omissions render the Proxy false and misleading in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

8.    The Proxy advises that a special meeting of Mandiant Stockholders will be held on June 3, 2022, to vote on the Merger and certain related proposals ("Stockholder Vote"). The material disclosure violations alleged herein must be cured in advance of the Stockholder Vote to enable Mandiant Stockholders to cast informed votes with respect to the Merger. Therefore, Plaintiff seeks to enjoin the Defendant from proceeding with the Stockholder Vote until such violations are cured. Alternatively, if the Merger is consummated, Plaintiff reserves the right to recover post-close damages suffered by herself and similarly-situated investors as a result of such violations.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange

Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

10.     This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See D'Addario v. Geller*, 264 F. Supp. 2d 367, 389 (E.D. Va. 2003) (Exchange Act "merely requires personal service anywhere in the United States in order to properly assert personal jurisdiction, as long as that service comports with due process requirements."); *Moon Joo Yu v. Premiere Power LLC*, No. 14 CIV. 7588 KPF, 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (because Exchange Act provides for nationwide service of process, and Defendant resides within the United States, and conducts business within the United States, he should reasonably anticipate being haled into court in the United States, and Court's exercise of personal jurisdiction over Defendant with respect to Plaintiffs' securities fraud claim is proper).

11.     Venue is proper under 28 U.S.C. § 1391(b) because Defendants transact business in this District, and because the Company's headquarters are in this District.

## PARTIES

12.     Plaintiff is, and has been at all relevant times, a continuous stockholder of Mandiant common stock.

13.     Defendant Mandiant is a Delaware corporation with its principal executive offices located at 11951 Freedom Drive, 6th Floor, Reston, Virginia 20190.

14.     Defendant Kevin Mandia ("Mandia") has served as the Chief Executive Officer ("CEO") of Mandiant (and its predecessor, FireEye) since June 2016. Mandia was appointed to the Board in February 2016. Mandia is the largest individual shareholder of the Company with a 1.52% stake.

15.     Defendant Enrique Salem ("Salem") has served as a member of the Board since February 2013 and as Chairman of the Board since March 2017. Salem has been a managing director of Bain Capital Ventures ("Bain") since July 2014. As discussed below, Salem was a member of the transaction committee ("Transaction Committee") formed to oversee negotiation of the Merger with Google.

16.     Defendant Kimberly Alexy ("Alexy") has served as a member of the Board since January 2015. Since June 2005, Alexy has served as the principal of Alexy Capital Management, a private investment management firm that she founded. As discussed below, Alexy was a member of the Transaction Committee.

17.     Defendant Viral Patel ("Patel") has served as a member of the Board since December 2020. Since 2012, Patel has served as a Senior Managing Director in the Tactical Opportunities Group of The Blackstone Group Inc. ("Blackstone"). As discussed below, by virtue of the conversion rights of its preferred stock, Blackstone is Mandiant's largest shareholder with a 9.73% beneficial interest in the Company's common shares. As also discussed below, Patel was a member of the Transaction Committee.

18.     Defendant Arthur W. Coviello, Jr. ("Coviello") has served as a member of the Board since December 2020. Since 2015, Coviello has been an active investor and advisor in the technology industry, including as a partner at Rally Ventures ("Rally"), as an advisor to ClearSky Security Fund ("ClearSky"), and as a Senior Advisor to Blackstone's Tactical Opportunities Group (where, as noted, Patel is a Senior Managing Director). As discussed below, by virtue of the conversion rights of its preferred stock, ClearSky has a beneficial interest of 0.79% in the Company's common shares.

19.     Defendant Sara C. Andrews ("Andrews") has served as a member of the Board

5

since August 2020.

20.     Defendant Ronald E. F. Codd ("Codd") has served as a member of the Board since July 2012.

21.     Defendant Adrian McDermott ("McDermott") has served as a member of the Board since February 2019.

22.     Defendant Robert Switz ("Switz") has served as a member of the Board since September 2017.

23.     Defendants identified in paragraphs 14 to 22 are collectively referred to herein as the "Individual Defendants," and together with Mandiant, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Mandiant's Business

24.     Mandiant (formerly known as FireEye before a name change in 2021) provides intelligence-based cybersecurity solutions and services that allow organizations to prepare for, prevent, investigate, respond to and remediate cyber-attacks, including attacks that target on premises, cloud, and critical infrastructure environments.

### Mandiant's Corporate History

25.     Mandia founded Mandiant as Red Cliff Consulting in 2004 before rebranding the business as "Mandiant" in 2006. At the time, Mandiant provided cybersecurity incident response and general security consulting along with incident management products to major global organizations, governments, and Fortune 100 companies. Its 2012 revenues were over $100 million.

26.     In December 2013, Mandiant was acquired by FireEye for $1 billion. FireEye provided hardware, software, and services to investigate cybersecurity attacks, protect against

malicious software, and analyze IT security risks. As noted, Mandia was named CEO of FireEye in June 2016.

**FireEye's Acquisition of Verodin, Inc.**

27.     Verodin, Inc. ("Verodin") was founded in 2014 to provide organizations with tools to measure, manage and improve the effectiveness of their cybersecurity technologies and processes.

28.     In June 2016, Verodin raised $10 million in a Series A round from five firms, including Rally (where Defendant Coviello is a partner), ClearSky (whom Coviello advises) and Blackstone (where Defendant Patel is a Senior Managing Director and whom Coviello advises).

29.     In June 2018, Verodin raised $21 million in a Series B round from five firms, including ClearSky.

30.     On May 28, 2019, with Mandia serving as CEO, FireEye announced the acquisition of Verodin for approximately $250 million, consisting of cash and 8,404,609 shares of FireEye common stock (valued at approximately $126 million as of May 28, 2019), thus cashing out Rally, ClearSky and Blackstone from their investment in Verodin.

**The Preferred Stock Transaction**

31.     On November 19, 2020, FireEye, announced entry into preferred stock purchase agreements ("Preferred Stock Agreements") with (i) Blackstone, and (ii) ClearSky, pursuant to which FireEye sold 400,000 shares of 4.5% Series A Convertible Preferred Stock ("Preferred Stock") to Blackstone (370,000 shares) and ClearSky (30,000 shares) at a price of $1,000 per share for proceeds of $400 million. Under the Preferred Stock Agreements, the Preferred Stock was convertible into Mandiant common stock at a conversion price equal to $18.00, subject to adjustment.

7

32.     Under the Preferred Stock Agreements, for so long as Blackstone holds 65% of the Preferred Stock, it has the right to nominate for election one member to the Board. Defendant Patel joined the Board as Blackstone's nominee in December 2020. Defendant Coviello, who serves as an advisor to both Blackstone and ClearSky, also joined the Board in December 2020.

33.     Under the Merger Agreement, the Preferred Stock issued to Blackstone and ClearSky will be converted into common stock and receive the Merger Consideration (which will make Blackstone the largest shareholder of Mandiant).

**FireEye's Acquisition of Respond Software, Inc.**

34.     Respond Software, Inc. ("Respond") was founded in April 2016 to help organizations automate cybersecurity threat protection.

35.     In May 2019, Respond raised $20 million in a Series B round from three firms, including ClearSky.

36.     On November 19, 2020, FireEye announced the acquisition of Respond for approximately $186 million in cash and 4,931,862 shares of FireEye common stock (valued at approximately $67 million as of November 18, 2020). FireEye announced the acquisition of Respond the same day as it announced the Preferred Stock Agreements, thus ultimately using funds invested by ClearSky in FireEye under the Preferred Stock Agreements to cash out ClearSky from its investment in Respond.

**Mutually Beneficial Business Relationships Between Salem and Mandia**

37.     Salem—a member of the Transaction Committee—has through Bain co-invested alongside Mandia in his personal capacity in at least two venture-backed cybersecurity deals. First, in July 2017, Bain (where Salem was already serving as a managing director) invested in Awake Security ("Awake").  Salem joined Awake's board, and in October 2019, Mandia also joined

Awake's board.  In April 2020, Awake raised another $36 million from Bain and others. In September 2020, Arista acquired Awake for an undisclosed price (Awake had received $80 million in funding before the acquisition so the sale price was clearly in the nine figures).

38.     Second in March 2022, VISO Trust ("VISO") raised $11 million from Bain. Mandia personally invested in the round, and Salem joined VISO's Board.[2]

**Divestiture of the FireEye Products Business**

39.     In early 2021, with the assistance of Goldman Sachs, the Company began actively exploring the sale of the FireEye brand and products business. On March 4, 2021, to assist in this process, the Board established the Transaction Committee, which was authorized to, among other things, (i) consider, analyze and evaluate strategic alternatives available to the Company; (ii) approach potential strategic and financial acquirers regarding strategic alternatives, and to negotiate with such parties; (iii) oversee and provide assistance to Mandiant management and Mandiant's advisers with respect to the consideration, analysis and evaluation of any strategic alternative; and (iv) recommend to the Board what action, if any, should be taken with respect to any strategic alternative.

40.     The Mandiant Board appointed Defendants Alexy, Patel and Salem to serve as the members of the Transaction Committee, notwithstanding that, as noted, (i) Patel had interests that differed from those of public Mandiant Stockholders because of the large preferred stock position of his firm, Blackstone, and (ii) Salem and Mandia have mutually beneficial business relationships outside of Mandiant that render Salem not independent of Mandia.

41.     On June 2, 2021, FireEye announced the sale of its name and products business to

---

[2] Defendants Alexy and Salem also share mutually beneficial business relationships. Aside from sitting on the Mandiant Board, both presently also sit on the boards of (i) NetSkope, a leading privately-held cybersecurity firm, and (ii) Redis, a leading privately-held database firm.

Symphony Technology Group ("STG") for $1.2 billion ("FireEye Divestiture"). STG later combined FireEye with its McAfee enterprise security business to launch Trellix. Two of the founders of STG are alumni of Bain (where Defendant Salem currently serves as a managing director).

42.     After the FireEye Divestiture, the Company rebranded as "Mandiant."

**Background to the Merger**

43.     During June and July 2021—after announcing the FireEye Divestiture—Mandia spoke, on an individual basis, with members of the Board about a possible sale of Mandiant. Subsequently, between September 2021 and November 2021, Mandia had preliminary conversations with representatives of a number of potential acquirers.

44.     On December 7, 2021, the Board began a more formalized process of reviewing strategic alternatives. To that end, the Board determined that the Transaction Committee should oversee the process, and authorized Goldman Sachs to reach out to potential strategic and financial acquirers, including Google.

45.     On December 17, 2021, members of Mandiant management gave a presentation to Google. Thereafter, in January and February 2022, Google conducted initial due diligence.

46.     Between February 10-16, 2022, Mandia had *four* conversations with senior executives at Google concerning Google's interest in acquiring Mandiant.

47.     On February 16, 2022, the Transaction Committee approved financial projections for use by Goldman Sachs in preparing a fairness opinion in connection with any transaction.

48.     On February 21, 2022, Defendant Mandia had another conversation with a senior executive at Google who advised that Google would be submitting a proposal to acquire Mandiant. Later that day, Google submitted a non-binding written proposal to acquire Mandiant for $22.00

per share in cash.

49.     On February 22, 2022, the Board met to discuss Google's bid. The Board instructed Goldman Sachs to make a counterproposal to Google for an acquisition $24.00 per share in cash. At the same meeting, the members of the Transaction Committee requested a call between Defendants Salem and Mandia and Google's CEO, Sundar Pichai ("Pichai"), to discuss Google's institutional commitment to an acquisition of Mandiant. Prior to such call, Mandia advised the Board that he had not "engaged in discussions with [Google] regarding any post-acquisition employment terms with [Google]."

50.     Following the Board meeting, Goldman Sachs made a counterproposal to Google for an acquisition for $24.00 per share in cash. In response, Google increased its offer to $23.00 per share in cash, and agreed to arrange a call between Pichai, and Salem and Mandia. The call between Pichai, and Salem and Mandia occurred later that day.

51.     After the call, Salem and Mandia reported back to the members of the Transaction Committee and other members of the Board concerning their conversation with Pichai. Thereafter, the Transaction Committee determined to move forward with the $23.00 per share in cash bid from Google, and to negotiate exclusively with Google through March 10, 2022.

52.     During late February 2022 and early March 2022, the parties negotiated the Merger Agreement.

53.     On March 6, 2022, at the specific request of Google, the Transaction Committee authorized Mandia to begin discussions with Google "concerning the terms of his employment with [Google] following the merger." That same day, Google's counsel provided a draft non-competition agreement for Mandia to Mandiant's counsel, who then shared it with Mandia and his counsel.

54.     On March 7, 2022, Mandia received a draft employment offer from Google. Later on March 7, 2022, Mandia updated the Board concerning the nature of the noncompetition obligations that Google was requiring of him, and advised that negotiations with Google were continuing with respect to the terms of his employment following the Merger.

55.     Later on March 7, 2022, Goldman Sachs orally presented (and later committed to writing) its fairness opinion ("Fairness Opinion") concluding that the $23.00 per share in cash to be paid by Google was fair, from a financial point of view, to Mandiant Stockholders. Following receipt of the Fairness Opinion, the Board approved the Merger and resolved to recommend to Mandiant Stockholders that they vote in favor of the Merger. The parties thereafter executed the Merger Agreement, Mandia's non-competition agreement, and certain voting agreements under which Blackstone, ClearSky, and Mandia agreed to vote their shares—constituting approximately 11.8% of Mandiant's outstanding common stock—in favor of the Merger.

56.     On March 8, 2022, Mandiant and Google announced the Merger.

**Statements in the Proxy Regarding the Interests of Mandiant's Directors and Officers That May Differ From or Be in Addition to the Interests of Public Mandiant Stockholders**

57.     The Proxy contains multiple statements regarding the interests of Mandiant's directors and officers that may differ from or be in addition to the interests of public Mandiant Stockholders, and reassurances that the Board was aware of and took these differing and/or additional interests into account in approving the Merger and recommending that Mandiant Stockholders vote in favor of the Merger (collectively, the "Potential Director/Officer Conflict Statements"). First, the Proxy cautions Mandiant Stockholders that "[w]hen considering the recommendation of the Mandiant Board that you vote to approve the proposal to adopt the merger agreement, *you should be aware that our directors and executive officers may have interests in the merger that are different from, or in addition to, your interests as a stockholder*."

12

58.     The Proxy then assures Mandiant Stockholders that "[i]n (1) evaluating and negotiating the merger agreement, (2) approving the merger agreement and the merger and (3) recommending that the merger agreement be adopted by our stockholders, ***the Mandiant Board was aware of and considered these interests to the extent that they existed at the time, among other matters***."

59.     Among the different or additional interests of Mandiant's directors and officers of which Mandiant Stockholders should be aware, and that the Board considered in approving and recommending the Merger, the Proxy identifies the following potential conflict with respect to Mandia:

> For Kevin Mandia, our chief executive officer, ***the entitlement to receive cash and equity incentives under a new offer letter with [Google]*** and a voting agreement with [Google] and Mandiant, which obligates Mr. Mandia to vote certain of his shares of Mandiant's common stock in favor of the adoption of the merger agreement and against any competing transaction.

60.     Despite acknowledging the materiality of the "cash and equity incentives" offered by Google to Mandia, and that the Board considered these "cash and equity incentives" in approving and recommending the Merger, the Proxy never discloses the nature and magnitude of these "cash and equity incentives."

61.     In the "Questions and Answers" section of the Proxy, the Proxy poses the following commonly asked question: "Do any of Mandiant's directors or officers have interests in the merger that may differ from those of Mandiant stockholders generally?" The Proxy answers:

> Yes. In considering the recommendation of the Mandiant Board with respect to the proposal to adopt the merger agreement, ***you should be aware that our directors and executive officers may have interests in the merger that are different from, or in addition to, the interests of our stockholders generally***. In: (1) evaluating and negotiating the merger agreement; (2) approving the merger agreement and the merger; and (3) unanimously recommending that the merger agreement be adopted by our stockholders, ***the Mandiant Board was aware of and considered these interests to the extent that they existed at the time***, among other matters. For more

information, see the section of this proxy statement captioned "The Merger — Interests of Mandiant's Directors and Executive Officers in the Merger."

62.     Thereafter, the Proxy advises that, in concluding that the Merger was in the best interests of Mandiant Stockholders, and recommending that Mandiant Stockholders vote in favor of the Merger, the Board considered a number of uncertainties and risks and other potentially negative factors, including "[t]he interests that our directors and executive officers may have in the merger, which may be different from, or in addition to, those of our other stockholders."

63.     In a section of the Proxy entitled "Interests of Mandiant's Directors and Executive Officers in the Merger," the Proxy purports to itemize all of the interests of Mandiant's directors and officers that differ from, or are in addition to, the interests of public Mandiant Stockholders. The section first identifies the conversion of restricted stock units ("RSU's"), performance-based equity awards ("PSU's"), and options into a right to receive the Merger Consideration upon the consummation of the Merger. It then purports to summarize the equity interests of Mandiant's directors and officers in the following table, which shows the amount of cash that each of Mandiant's directors and officers can expect to receive for their Mandiant common stock, and from acceleration of their restricted stock units and performance-based equity awards in connection with the Merger— including over $85 million in cash to be collected by Mandia personally:

| Name | Shares Held Directly(1) | | Mandiant Restricted Stock Units(2) | | Mandiant PSUs(2) | | Total ($) |
|---|---|---|---|---|---|---|---|
| | Number of Shares (#) | Value of Shares ($) | Number of Shares (#) | Value ($) | Number of Shares (#) | Value ($) | |
| Kimberly Alexy | 93,252 | 2,144,796 | — | — | — | — | 2,144,796 |
| Sara C. Andrews | 13,172 | 302,956 | 16,692 | 383,916 | — | — | 686,872 |
| Ronald E.F. Codd | 5,075(3) | 116,725 | — | — | — | — | 116,725 |
| Arthur W. Coviello, Jr. | 14,292(4) | 328,716 | 19,281 | 443,463 | — | — | 772,179 |
| Adrian McDermott | 39,759 | 914,457 | — | — | — | — | 914,457 |
| Viral Patel | — | — | — | — | — | — | — |
| Enrique Salem | 290,513 | 6,681,799 | — | — | — | — | 6,681,799 |
| Robert Switz | 78,334 | 1,801,682 | — | — | — | — | 1,801,682 |
| Alexa King | 191,579(5) | 4,406,317 | — | — | — | — | 4,406,317 |
| Peter Bailey | 46,421(6) | 1,067,683 | 114,922 | 2,643,206 | 163,000 | 3,749,000 | 7,459,889 |
| Kevin R. Mandia | 3,071,877(7) | 70,653,171 | 312,157 | 7,179,611 | 315,999 | 7,267,977 | 85,100,759 |
| William T. Robbins | 99,357 | 2,285,211 | 168,720 | 3,880,560 | 193,000 | 4,439,000 | 10,604,771 |
| Frank E. Verdecanna | 416,194 | 9,572,462 | 140,439 | 3,230,097 | 149,249 | 3,432,727 | 16,235,286 |
| John P. Watters | 212,563(8) | 4,888,949 | 192,188 | 4,420,324 | 225,000(9) | 5,175,000 | 14,484,273 |

**The Potential Director/Officer Conflict Statements Omit Material Facts Necessary to Make Them Not Misleading**

64.     The Potential Director/Officer Conflict Statements in the Proxy repeatedly acknowledge that the interests of Mandiant directors and officers that differ from or are in addition to the interests of public Mandiant Stockholders are material facts of importance to Mandiant Stockholders (*see, e.g.,* Proxy at 7 ("***you should be aware*** that our directors and executive officers may have interests in the merger that are different from, or in addition to, your interests as a stockholder;" at 25 ("Q: "Do any of Mandiant's directors or officers have interests in the merger that may differ from those of Mandiant stockholders generally?" A: ***Yes***. In considering the recommendation of the Mandiant Board with respect to the proposal to adopt the merger agreement, ***you should be aware*** that our directors and executive officers may have interests in the merger that are different from, or in addition to, the interests of our stockholders generally.").

65.     The Potential Director/Officer Conflict Statements also repeatedly reassure Mandiant Stockholders that the Board considered all of these interests in connection with approving and recommending the Merger.

66.     Yet, in two respects, those Statements omit material facts necessary to make them not misleading.

***Material Omissions Concerning the Nature and Magnitude of the Cash and***
***Equity Incentives in the New Offer Letter from Google***

67.     As noted above, the Proxy (i) concedes that Mandia's "entitlement to receive cash and equity incentives under a new offer letter with [Google]" are among the interests of Mandiant's directors and officers that "differ from or are in addition to" the interests of public Mandiant Stockholders and concerning which public Mandiant Stockholders should be aware, and (ii) represents that the Board considered this interest in connection with approving the Merger and recommending that Mandiant Stockholders vote in favor of the Merger.

68.     Yet, the Proxy fails to provide any details concerning the nature and magnitude of the "cash and equity incentives" in the "new offer letter" from Google. Given that (i) the Proxy concedes that these "cash and equity incentives" represent a material consideration about which Mandiant Stockholders should be aware, and (ii) the Board considered these "cash and equity incentives" in approving the Merger and recommending that Mandiant Stockholders vote in favor of the Merger, the Proxy must disclose the "cash and equity incentives" in the new offer letter from Google to Mandiant Stockholders in advance of the Stockholder Vote to enable them to cast informed votes.

***Material Omissions Concerning the Relationships Between Patel and Coviello, and
Blackstone and ClearSky***

69.     As noted, in the section of the Proxy entitled "Interests of Mandiant's Directors and

Executive Officers in the Merger," the Proxy purports to itemize all of the interests of Mandiant's

directors and officers that differ from, or are in addition to, the interests of public Mandiant

Stockholders. To that end, in that section, the Proxy presents the table depicted in paragraph 63

above (the "Equity Interests Table"), which purports to summarize the equity interests of

Mandiant's directors and officers in the Merger.

70.     The Equity Interests Table, however, misleads public Mandiant Stockholders

concerning the interests of Defendants Patel and Coviello in the Merger. Specifically, based on the

disclosures in the Equity Interests Table, a reasonable Mandiant Stockholder would conclude that

(i) Patel—a member of the Transaction Committee—has *no* economic interest in the Merger since

he is not is not receiving any cash payout from the Merger, and (i) Coviello only has a relatively

small economic interest in the Merger since he is only receiving a relatively small $772,179 cash

payout from the Merger.

71.     In fact, however, Patel and Coviello each have a very strong economic interest in

the consummation of the Merger since Patel's firm (Blackstone), and Coviello's advisory clients

(Blackstone and ClearSky) stand to earn substantial returns on their Preferred Stock investments

upon consummation of the Merger. Specifically, the Proxy discloses that (i) Blackstone's 370,000

shares of Preferred Stock are convertible into 22,757,008 shares of Mandiant common stock, and

(ii) ClearSky's 30,000 shares of Preferred Stock are convertible into 1,845,162 shares of Mandiant

common stock:

| Name of Beneficial Owner | Common Stock | | Convertible Preferred Stock | |
|---|---|---|---|---|
| | Number of Shares Beneficially Owned | Percentage of Shares Beneficially Owned | Number of Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
| *5% Stockholders:* | | | | |
| Blackstone Entities(1) | 22,757,008 | 9.73% | 370,000 | 92.5% |
| The Vanguard Group(2) | 21,727,091 | 9.29% | — | — |
| Allianz Global Investors U.S. LLC(3) | 14,032,951 | 6.00% | — | — |
| FMR LLC(4) | 21,694,412 | 9.27% | — | — |
| BlackRock, Inc.(5) | 13,321,460 | 5.69% | — | — |
| ClearSky Entities(6) | 1,845,162 | 0.79% | 30,000 | 7.5% |
| *Directors and Named Executive Officers:* | | | | |
| Peter Bailey(7) | 46,421 | * | — | — |
| Alexa King(8) | 191,579 | * | — | — |
| Kevin R. Mandia(9) | 3,556,753 | 1.52% | — | — |
| William T. Robbins(10) | 99,357 | * | — | — |
| Frank E. Verdecanna(11) | 416,194 | * | — | — |
| Kimberly Alexy | 82,904 | * | — | — |
| Sara C. Andrews | 8,347 | — | — | — |
| Ronald E. F. Codd(12) | 136,625 | * | — | — |
| Arthur W. Coviello, Jr.(13) | 22,519 | — | — | — |
| Adrian McDermott | 30,225 | * | — | — |
| Viral Patel | — | — | — | — |

72.      In connection with the Merger, Mandiant has agreed to convert all shares of Preferred Stock into shares of Mandiant common stock so that holders of the Preferred Stock will receive the $23.00 in cash being paid by Google for each share of common stock. As a result, upon consummation of the Merger, (i) Blackstone will receive approximately $523.4 million in cash (i.e., 22,757,008 shares of common stock upon conversion x $23.00 per share), which represents a $153.4 million profit on its $370 million investment in Preferred Stock in November 2020 under the Preferred Stock Agreements (not including any dividends previously paid on the Preferred Stock), and (ii) ClearSky will receive approximately $42.4 million (i.e., 1,845,162 shares of common stock upon conversion x $23.00 per share), which represents a $12.3 million profit on its $30 million investment in Preferred Stock in November 2020 under the Preferred Stock Agreements (not including any dividends previously paid on the Preferred Stock).

18

73.     Given (i) the acknowledgement in the multiple Potential Director/Officer Conflict Statements throughout the Proxy that interests of directors in the Merger are a material consideration for Mandiant Stockholders, (ii) the disclosure in the Equity Interests Table of the equity interests of directors and officers in the Merger based on, *inter alia*, the *conversion* of their RSU's and PSU's, and (iii) the substantial equity interest of Blackstone and ClearSky in the Merger in light of the conversion of their Preferred Stock, the failure to disclose the relationships between Patel and Coviello and Blackstone and ClearSky anywhere in the Proxy was an omission of material fact that rendered the Potential Director/Officer Conflict Statements and the Equity Interests Table misleading. Accordingly, the relationships between Patel and Coviello and Blackstone and ClearSky must be disclosed to Mandiant Stockholders in advance of the Stockholder Vote.

74.     The disclosure violation described above is particularly problematic with respect to Patel who sat on the Transaction Committee, and thus actively participated in the negotiation of the Merger. The independence of fiduciaries like Patel negotiating the sale of a public company on behalf of its public shareholders is a material consideration for such shareholders, and therefore a proxy omits material information when it fails to disclose even *potential* (not just actual) conflicts of interest of directors involved in negotiating a deal. It is also the case that large stockholders like Blackstone may have interests that differ from public stockholders because they often value immediacy of return over value maximization, and here Blackstone is earning a substantial return on its Preferred Stock investment in less than eighteen (18) months. Consequently, at a minimum, the failure to disclose the relationship between Patel and Blackstone was a material omission of fact that rendered the Potential Director/Officer Conflict Statements and the Equity Interests Table misleading.

**The Proxy Omits Material Facts Concerning the Existence of Any Discussions Between Google and Mandia Concerning the Prospect of Post-Merger Employment**

75.     Information that sheds light on the financial incentives and motivations of key members of management who are involved in negotiating a deal on the seller side is material to public stockholders. In particular, any discussion generally about post-close employment between the buyer and a negotiator on the seller side is a material fact that public stockholders would consider important to know because the prospect alone of post-Merger employment creates an economic motivation that could rationally lead a negotiator to favor a deal at less than fair value in light of these additional economic interests not shared with public stockholders.

76.     Here, the Proxy states that (i) on February 22, 2022, Mandia advised the Board that "neither he nor any member of Mandiant management had engaged in discussions with [Google] regarding any post-acquisition **employment terms** with [Google]," and (ii) on March 6, 2022—"in response to a specific request" from Google—the Board authorized Mandia "to begin discussions with [Google] concerning **the terms of employment** with [Google] following the Merger."

77.     But those statements are misleading. As the Delaware Chancery Court has explained, there is a meaningful distinction between discussing "employment terms" and discussing generally the prospect of post-Merger employment. *In re Mindbody, Inc*., No. CV 2019-0442-KSJM, 2020 WL 5870084, at *11 (Del. Ch. Oct. 2, 2020) (observing that the "Definitive Proxy stated that 'Vista and [Mindbody] *had not engaged in any employment or retention-related discussions* with regard to [Mindbody] management,' but the Supplemental Proxy stated more carefully that 'Vista and [Mindbody] *had not discussed <u>the terms</u> of post-closing employment or equity participation* for [Mindbody] management.").

78.     The Proxy here only confirms that Mandia and Google did not discuss "employment terms" before March 6, 2022. It does not confirm that Mandia and Google did not

have *any* discussions generally concerning the prospect of post-Merger employment before February 22, 2022 (the date on which Mandia advised the Board that he had not discussed "any post-acquisition **employment terms** with [Google]."). Indeed, as noted, between February 10-16, 2022, Mandia had *four* conversations with senior executives at Google concerning the status of Google's interest in acquiring Mandiant, and another discussion with senior executives of Google on February 21, 2022.

79.     Given all of these conversations between Mandia and senior Google executives, and the fact that (on March 6, 2022) Google requested the opportunity to negotiate "employment terms" with Mandia, it is certainly reasonable to infer that the prospect of post-Merger employment generally was discussed during Mandia's multiple conversations with Pichai and other senior Google executives, and that, like the proxy in *MindBody*, the Proxy here is being deliberately misleading in its choice of words when it states that no discussion of "employment terms" occurred until March 6, 2022. Supporting that inference is the speed with which Google transmitted drafts of agreements to Mandia over a span of just two days on March 6-7, 2022.

80.     Given that Mandia was actively involved in negotiating the Merger with Google, disclosure of any discussions concerning the prospect of post-Merger employment are material facts that must be disclosed to Mandiant stockholders in advance of the Stockholder Vote to allow them to cast informed votes.

**The Proxy Omits Material Facts Concerning a Material Prior Underwriting Relationship Between Goldman Sachs and Google**

81.     Concerning any prior relationships between Goldman Sachs and Google and its affiliates, the Proxy makes the following disclosure:

> Goldman Sachs also has provided certain financial advisory and/or **underwriting services** to [Google], **Alphabet** and/or their respective affiliates and portfolio companies from time to time for which the Investment Banking Division of

Goldman Sachs has received, and may receive, compensation, ***including*** having acted as financial advisor to Ionic Security Inc., a former portfolio company of Google Ventures, an affiliate of ***Alphabet***, with respect to its sale in April 2021; and as financial advisor to Kobalt Music Group Limited, a former portfolio company of Google Ventures, with respect to its sale in May 2021. ***During the two year period ended March 7, 2022***, Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to [Google], ***Alphabet*** and/or their respective affiliates and portfolio companies of ***approximately $5 million***.

82.     This statement is misleading because the Proxy fails to disclose that on or about August 3, 2020—within "the two-year period ended March 7, 2022"—Google's parent, Alphabet, consummated a $10 billion convertible notes offering ("August 2020 Alphabet Offering") for which Goldman Sachs was one of the three top joint book-running managers with an allocation of approximately $1.1 billion, and on which Goldman Sachs earned approximately $7.3 million in underwriting fees, according to SEC filings. Thus, the statement that Goldman Sachs only earned "approximately $5 million" from Google and its affiliates, including Alphabet, during the two-year period ended March 7, 2022, was false in light of the additional $7.3 million in underwriting fees earned by Goldman Sachs from the August 2020 Alphabet Offering alone.

83.     What makes the non-disclosure of the August 2020 Alphabet Offering particularly odd is that the Proxy discloses that Goldman Sachs "acted as bookrunner with respect to the offering by Mandiant of 0.875% Convertible Senior Notes due 2024 in an aggregate principal amount of $600 million." Yet, Goldman Sachs's role in the much larger $10 billion August 2020 Alphabet Offering is not disclosed.

84.     Information that bears on whether a financial advisor has even a potential conflict of interest is material to stockholders when deciding how to vote on a merger. Here, because (i) Goldman Sachs played a highly active role in negotiating the Merger with Google, and (ii) the Board's decision to approve the Merger and to recommend that Mandiant Stockholders vote to

approve the Merger was based in part on the Fairness Opinion, any conflicts Goldman Sachs had that might have (i) predisposed it to favor Google in some manner, and (ii) prevented it from providing unbiased advice to the Board concerning the fairness of the Merger Consideration, would be material to the decision of Mandiant Stockholders of whether to vote in favor of the Merger.

85.     To help them cast informed votes with respect to the Merger, Mandiant Stockholders are entitled to disclosure of the August 2020 Alphabet Offering and confirmation of the fees earned by Goldman Sachs thereon, to enable them to evaluate whether Goldman Sachs's role in such Offering—and the prospect of participating as a leading bookrunner on future Alphabet offerings—created a conflict of interest material enough to taint the reliability of the Financial Opinion and otherwise negatively affect the ability of Goldman Sachs to provide unbiased advice to the Board.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class ("Class") consisting of all individuals and entities that were Mandiant common shareholders of record as of the close of business on April 6, 2022 ("Class Period"), the record date for Mandiant common shareholders eligible to vote on the merger of Mandiant and Google. Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

87.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

88.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, the Proxy discloses that, as of April 6, 2022, there were 233,978,294 shares of Mandiant common stock outstanding. All members of the Class may be identified from records maintained by Mandiant or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

89.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws specified above.

90.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests antagonistic to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in securities class action litigation of this nature.

91.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(i)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(ii)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(iii)   Whether Plaintiff and the other members of the Class are entitled to injunctive relief.

92.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

93.     Defendants have acted, or refused to act, on grounds generally applicable to the

Class as a whole, and are causing injury to the entire Class. Therefore, injunctive relief on behalf of the Class as a whole is appropriate.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants**
**for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

94.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

95.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

96.     Defendants disseminated the false and misleading Proxy, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

97.     By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

98.     Yet, as specified in paragraphs 64-85 above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants (i) made untrue statements of material fact in the Proxy, and (ii) omitted material facts from the Proxy necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Mandiant Stockholders to vote in favor of the Merger and related proposals. Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

99.     The material misrepresentations and omissions in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Mandiant Stockholder would consider them important in deciding whether to vote in favor of the Merger and related proposals. In addition, a reasonable Mandiant Stockholder would view disclosures of the omitted facts specified above as significantly altering the "total mix" of information made available to Mandiant Stockholders.

100.    Because of the material misrepresentations and omissions in the Proxy specified above, Plaintiff and other Mandiant Stockholders are threatened with irreparable harm insofar as Plaintiff and other Mandiant Stockholders will be deprived of their entitlement to make a fully informed decision as to how to vote on the Merger and related proposals if such material misrepresentations and omissions are not corrected before the Stockholder Vote. Therefore, injunctive relief is appropriate.

## COUNT II

**Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

101.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein

102.    The Individual Defendants acted as controlling persons of Mandiant within the

meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Mandiant, and participation in, and/or awareness of Mandiant's operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Mandiant with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

103.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

104.    Each of the Individual Defendants had direct and supervisory involvement in the negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Proxy at issue references the unanimous recommendation of the Board to approve the Merger, and recommend that Mandiant Stockholders vote for the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

105.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval. The Individual Defendants thus directly participated in the drafting of the Proxy.

106.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a)

of the Exchange Act.

107.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

108.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict, and can Plaintiff and other Mandiant Stockholders make an informed decision about whether to vote for the Merger.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Ordering that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative, and Plaintiff's counsel as Class counsel;

B.    Preliminarily and permanently enjoining Defendants and their counsel, employees and all other agents and persons acting in concert with them from proceeding with and holding the Stockholder Vote and consummating the Merger, unless and until Defendants disclose and disseminate to Mandiant Stockholders the material information specified above that has been omitted from the Proxy, and correct any false and misleading statements in the Proxy;

C.    Rescinding, to the extent already implemented, the Merger Agreement or any of the transactions contemplated thereby, or granting Plaintiff rescissory damages;

D.      Directing Defendants to account to Plaintiff for all damages suffered as a result of their misconduct;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees and expenses; and

F.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: May 10, 2022                                     **LAW OFFICE OF SAMUEL C. MOORE, PLLC**

/s/ Alexander P. Faig
Alexander P. Faig, VSB 96248
Samuel C. Moore, VSB 73233
526 King St., Suite 506
Alexandria, VA 22314
Tel.: 703.535.7809
Fax.: 571.223.5234
Email: scmoore@scmoorelaw.com
Email: afaig@scmoorelaw.com

*Local Counsel for Plaintiff and the Proposed Class*

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter (*pro hac vice to be requested*)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6818
Fax: (718) 504-3773
Email: jfruchter@wohlfruchter.com

*Counsel for Plaintiff and the Proposed Class*